John K. Buche (CA Bar No. 239477)
Byron Ma (CA Bar No. 299706)
BUCHE & ASSOCIATES, P.C.
875 Prospect St., Suite 305
La Jolla, CA 92037
Tel.: (858) 459-9111
Fax: (858) 430-2426
E-mail: jbuche@buchelaw.com
E-mail: bma@buchelaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| ANTHONY HUFF, decedent's father, and as representative of the Estate of J. H.; and on behalf of minor child, M. H.<br><br>          **Plaintiffs,**<br><br>   v.<br><br>THOUSANDSHORES, INC., a California Corporation a/k/a "ESKY-Sky of Electronics", a California corporation; SHENZHEN THOUSANDSHORES TECHNOLOGY CO., LTD., a Chinese Limited Liability Company; Amazon.com Services, LLC ("AMAZON"), is a Delaware limited liability company; and DOES 1-50, inclusive.<br><br>          **Defendants.** | Civil Action No.: 4:21-cv-2173<br><br>**PLAINTIFFS' ORIGINAL COMPLAINT FOR DAMAGES AND INJUNCTION:**<br><br>**(1) PRODUCTS LIABILITY-NEGLIGENCE;**<br>**(2) STRICT PRODUCTS LIABILITY-DESIGN AND MANUFACTUING DEFECT;**<br>**(3) STRICT PRODUCTS LIABILITY-FAILURE TO WARN;**<br>**(4) BREACH OF IMPLIED WARRANTIES;**<br>**(5) NEGLIGENT UNDERTAKING**<br>**(6) BREACH OF EXPRESS WARRANTY**<br>**(7) WRONGFUL DEATH**<br>**(8) SURVIVAL ACTION**<br>**(9) BYSTANDER CLAIMS**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

COME NOW the PLAINTIFFS Anthony Huff, individually, and on behalf of the estate of J. H., and on behalf of minor child, M. H. (collectively "PLAINTIFFS"), and complain against the above-named DEFENDANTS and for causes of action against the DEFENDANTS, allege as follows:

## I.      INTRODUCTION

1.      J. H. ("JOHNATHAN") was a 23-month old child who died after he ingested a button battery that fell out of a wireless keyfinder remote control.  JOHNATHAN died on December 20, 2020, four days after ingesting the battery.

2.      The damage from the battery was so severe to JOHNATHAN's young body, that even his parents, who are trained health care providers, could not save him.  The button battery burned through small JOHNATHAN's esophagus, intestines, and aorta, causing catastrophic bleeding.

3.      The product in question was a wireless keyfinder system sold under the "ESKY" brand.  These products were unreasonably dangerous to consumers and this is a product liability action to address those dangers.  The tragedy in question did not need to happen, and it would not have happened if the products were manufactured, marketed and sold in a manner that was safe.  PLAINTIFFS, through this lawsuit, also seek to prevent such catastrophes to other unsuspecting parents and innocent children.

4.      The horrendous dangers posed to young children by easily accessible lithium button batteries have been well documented in recent years.  They have been noted by consumer protection groups, physicians, the media, and even some elements of the electronics industry,

COMPLAINT

who have lobbied for alternative designs to prevent needless tragedies such as have happened to baby JOHNATHAN.   There are industry standards for manufacturers and sellers to protect compartments that contain button batteries.   But if safer alternatives are ignored, and unreasonably dangerous products are recklessly thrust into commerce, where they fall into the hands of innocent children, those safety standards and recommendations are meaningless to prevent foreseeable harm.

5.     This lawsuit is based on the design defects, negligence, failures to warn, and breaches of warranties that led to the death of a small child.

## II.   PARTIES

6.     Plaintiffs are Anthony Huff, individually as parent, and as the representative of the estate of his son, J. H., and his other minor son, M. H. (collectively "PLAINTIFFS").   The PLAINTIFFS are residents of Greensboro, North Carolina, as was 23-month JOHNATHAN.

7.     Defendant Thousandshores, Inc., ("THOUSANDSHORES") is a California Corporation, with a place of business at 33442 Western Ave., Union City, CA 94587. THOUSANDSHORES identifies a principal place of business as 37707 Cherry St., Newark, California 94560.   It conducts operations also from 2997 River Bend Circle, Livermore, California 94550.   The company is a distributor and seller, and on information and belief, a manufacturer and designer of defective products at issue in this lawsuit, which defective products were designed and put into the stream of commerce in California. THOUSANDSHORES also does business as "ESKY" at https://www.eskynow.com/about/our-story. They sell multiple wireless keyfinders through, https://www.eskynow.com/category/Key-

3

Finder and also through Amazon Store at https://www.amazon.com/stores/Esky/page/A9E575F5-3D93-4790-9165-92493268C5B0?ref_=ast_bln.  Service of process is proper on this Defendant by and through its registered agent for service of process: Qiusheng Lin, at 37707 Cherry St., Newark, California 94560; or also on its CEO (Ding He) or Secretary (Yanyan Wang), at 2997 Rivers Bend Circle, Livermore, California, 94550, or alternately at 37707 Cherry St., Newark, California 94560.

8.   Defendant ShenZhen Thousandshores Technology Co., Ltd., ("SHENZHEN") is a Chinese Limited Liability Company, with principal address of North Lane 2, Chuangye 2nd Road Bao'an, 5F, Chuangxin, 7-Star Creative Sq, Shenzhen, China 518000.  This defendant is believed to be a manufacturer of the defective products.   On information and belief, SHENZHEN ships defective products from China into this district in California, where they enter commerce and are imported, and are then further distributed throughout the United States. Service of Process is proper on SHENZHEN, through, on information and belief, is its agent in the United States (in California), or a wholly owned U.S. subsidiary corporation which shares part of its name, THOUSANDSHORES, and since SHENZHEN has extensive distributions and contacts in this district and the United States.  Service of process would also be proper by and through the Hague Convention and FRCP 4(f).

9.   Defendant Amazon.com Services, LLC ("AMAZON"), is a Delaware limited liability company, with a principal address at 410 Terry Ave N, Seattle, Washington 98109.  The registered agent for service of process is The Prentice-Hall Corporation System, Inc. (C0257078), 251 Little Falls Drive, Wilmington, DE 19808, but with identified registered

4

COMPLAINT

address for service of process in California being 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

### III.    JURISDICTION AND VENUE

10.    This Court has jurisdiction because of diversity between the parties under 28 U.S.C. § 1332(a).  The Plaintiffs and Defendants have complete diversity of citizenship at the time of filing and the dispute far exceeds $75,000 in controversy, exclusive of interest, punitive damages, attorney fees or other litigation costs.

11.    Venue is proper in this Court under 28 U.S.C. §1391(b)(1)(d).  Defendants conduct substantial and extensive business in the State of California, and in this federal judicial district (serving Alameda County), and are also believed to have designed, imported, promoted and distributed defective products in California; therefore, they are subject to the Court's personal jurisdiction in this district, and accordingly reside in this district for venue purposes.

### IV.    GENERAL FACTS

12.    On or about December 16th, 2020, JOHNATHAN swallowed a button battery. The button battery fell out of an "ESKY" brand wireless keyfinder remote, Model KF06A (hereinafter "Product" or "Defective Product"). The Defective Product is depicted here in a photo from the ESKY website:

COMPLAINT

1
2
3
4
5
6
7
8



9
10
11

13.     The button battery in question fell out of the remote because the sliding door to the remote has no safety precautions whatsoever that would prevent sliding off of the battery compartment access cover.  There are no screws, interference fits, keys, or other devices that might have kept the battery secure in the remote and out of the hands of small children.  ESKY's own website demonstrates the lack of safety measures and how easily the remote battery cover simply slides off.  The transmitter remote has no safety measure in place to prevent it opening: https://www.eskynow.com/product/Key-Finder-Esky-Wireless-Control1-RF-Transmitter-and-6-Receivers

12
13
14
15
16
17
18
19



20
21
22
23
24
25
26
27
28

14.   As can be seen above, the remote, which is also sometimes referred to as a "transmitter" has zero safety measures in place to keep the cover from sliding off.  The small remote has a simple "drawer" battery compartment which slides easily away to expose the battery.  Each of the key finders are known as "receivers" and they did require some form of a key to open, but the remote itself had no precautions.

15.   The Defective Product was sold in a package that included a variety of button batteries, whose dangers are well known to those in the industry, and yet the products were also delivered without *any* instructions or warnings to consumers about either the dangers of button batteries themselves; choking hazards generally; how to safely install button batteries in the remote; dangers of the remote; or the importance of keeping button batteries away from small children or animals.  The only warning in place said: "Warning: Do not mix old and new batteries.  Do not mix Alkaline, standard (carbon-zinc) or rechargeable batteries)."



COMPLAINT

16.     The button battery that fell out of the remote was a VAVTT® brand product from Malaysia.  It was a CR2032 lithium-ion type battery.  There were no warnings, tabs, or stickers on or with the batteries about the dangers of ingestion, or the hazards to children.

17.     The Defective Product was purchased on Amazon.com. This is no surprise, since Amazon is likely the world's most popular e-commerce website.  The Product was featured and located on AMAZON.  The Defective Product was placed in AMAZON's "cart" and ordered through an Amazon Prime account on July 27, 2020, Order #113-4100796-9804227.   The product was $23.31.  It was paid to AMAZON using an AMAZON credit card, an AMAZON receipt was given, AMAZON tracking was employed, and it was delivered directly the PLAINTIFFS' residence.  AMAZON charged for the purchase and AMAZON received the payment.   The Defective Product was packaged in AMAZON boxes and labeled with AMAZON Prime packaging materials. Through the process, all contacts were through AMAZON.  It appears the order was filled through an AMAZON fulfilment center, and/or using AMAZON delivery trucks.  On information and belief, the Defective Product was shipped from a location at an AMAZON warehouse.

18.     AMAZON routinely sends out email blasts advertising the Defective Product to prospective consumers who may have viewed it online, so it is involved in marketing and directly selling to consumers of the specific Defective Products.

19.     AMAZON   controls   the   terms   of   the   relationship   it   has   with THOUSANDSHORES via at least a Business Solutions Agreement ("BSA").  On information and belief, AMAZON controls the conditions of THOUSANSHORE's access to the end

8

COMPLAINT

customers; sets the terms of the THOUSANSHORE's Amazon store front; and requires indemnification as well as substantial fees on each purchase.   AMAZON acted as an intermediary between suppliers and customers; they accepted the order; billed the consumer and remitted proceeds to the upstream suppliers.   AMAZON had control of the product and the transaction.   What is clear is that AMAZON placed itself squarely in the chain of distribution of the Defective Product and has profited from its role making sure the Defective Product ended up in the hands of consumers like the PLAINTIFFS, and ultimately a defenseless little boy.

20.   Given AMAZON's role in our society in the distribution of goods, it is uniquely poised to prevent harms, and in this case to take pro-active steps to suspend sales of Defective Products and warn unsuspecting consumers of the significant dangers posed by these Defective Products.   The dangers of these Defective Products foreseeably extend to its customers, and those who may encounter these products, and especially to small children and animals.

21.   In today's society, AMAZON enjoys great power in controlling the flow of products.   While AMAZON has, at times, legally challenged its position as a "seller," the reality is that it has been handsomely rewarded for its sales of products.   In the fourth quarter of 2020 alone,     it     publicly     reported     generating     $125.56     Billion     in     sales. https://www.cnbc.com/2021/02/02/amazon-amzn-earnings-q4-2020.html     With wealth and power of this magnitude, comes a responsibility and ability to help curb the spread of dangerous products to unsuspecting consumers.   It is a hope of the PLAINTIFFS and undersigned counsel that AMAZON will use its tremendous power to help families, like the Huffs, and protect them from egregiously unsafe products.

9

COMPLAINT

22.    The dangers of button batteries like these are well known to those in the manufacturing industry.  As early as May 12, 2012, on NBC's "The Today Show" there was an episode called *ER Visits Double as More Kids Swallow Batteries*.  According to the show, "Doctors say that the current from a three-volt battery can burn a hole in the esophagus in less than two hours."

23.    On May 24, 2010, *Pediatrics*, the official journal of the American Academy of Pediatrics ran an article titled *Preventing Battery Ingestion: An Analysis of 8648 Cases*. The article warned that "manufacturers should redesign household products to secure the battery ccompartment, possibly requiring a tool to open it."[1]

24.    On September 22, 2011, NEMA[2] and CEA[3] came out publicly to raise industry standards requiring either a tool or multiple simultaneous maneuvers to access a lithium battery compartment.  A variety of economically feasible alternatives are available to the drawer design sold by Defendants.  For example, there are remotes that have required coins to unscrew compartments.   There are also simple screws that could secure compartments.   These precautions would cost mere cents.

25.    And yet, according to the National Safety Council's 2021 website, a consumer safety organization, every year, more than 2,800 kids are treated in emergency rooms after swallowing button batteries.  The number of injuries and deaths have increased nine-fold in the last decade.  https://www.nsc.org/home-safety/safety-topics/child-safety/button-batteries

---

[1] May 24, 2010, *Pediatrics*, Litovitz, Whitaker, & Clark, *Preventing Battery Ingestions: An Analysis of 8648 Cases.*
[2] The Association of Electrical and Medical Imaging Equipment Manufacturers.
[3] Consumer Electronic Association.

10

COMPLAINT

26.    With respect to button batteries themselves, the U.S. Consumer Product Safety Commission recommends packages all feature "Keep out of reach" pictograms, and safety tabs that need to be removed before using coin cell batteries that are stamped or etched on the battery.    https://www.cpsc.gov/s3fs-public/Session-5a-CPSC-Toys-China-Sept-2016-Miller-FINAL-Eng.pdf?6_cno.uKkl9OwtiZNsbdy2cIWR1nzDaW    Samples of what might be more acceptable warnings on batteries are shown below:



27.    Unfortunately, the DEFENDANTS' Defective Product(s) had none of those security measures in place when they were needed.

28.    There were no product inserts describing the harms of button batteries generally; there were no warnings on the batteries themselves; and there were no mechanisms in place to keep the battery from dropping out of the drawer mechanism on the Defective Product.   On information and belief, at no point in the design of the Defective Products were they even subjected to drop tests, or stress tests to see whether the remotes would secure the coin cell batteries.

11

COMPLAINT

29.     There are also at least four well known standards for product configurations with requirements to prevent access to button battery compartments by children, which include ASTM F963 Toy Safety; ASTM F2923-11 Children's Jewelry; UL 60065 Audio Video Equipment; UL 4200A Products Incorporating Button Cell Batteries of Lithium of Similar Technologies.  These standards were not followed by DEFENDANTS in preventing harms from button batteries.

30.     Commendably, the government of Australia recently, on December 18, 2020, passed legislation mandating safety standards, including adherence to UL Standards and SAI Global Standards for all product containing button batteries so battery compartments are secure. https://www.productsafety.gov.au/standards/button-coin-batteries#consumer-goods-products-containing-button-coin-batteries-safety-standard

31.     Unfortunately, none of the known safety standard were followed in this case by DEFENDANTS.  Worse, since they are so well known, it appears that they were willfully or recklessly ignored.  To turn a blind eye, or ignore safety standards geared to protect small children is recklessly and grossly negligent in that it shows extreme disregard of the likely harm to consumers.

32.     On Wednesday, December 16, 2020, the Huff family was getting ready for work and school.  Young JOHNATHAN and his older brother walked into day-care holding hands. He appeared fine until lunch time.

33.     Then, during his post-lunch nap around midday, the teachers noticed that JOHNATHAN had plate-sized puddle of blood around his face.  Then, he started vomiting

COMPLAINT

blood. The day care called paramedics and the boy's mother, and she arrived on scene before the paramedics, since her work was close. Paramedics rushed to the day care and advised he visit a pediatrician to try and better understand the problem. The boy was pale and appeared tired.

34.    He was taken to a pediatrician, but the problem was not apparent at this point, and the family was instructed to return if anything unusual occurred.

35.    JOHNATHAN returned to school the following day, Thursday, and appeared fine, until about the last ten minutes of class, where he seemed overly tired. That evening, JOHNATHAN had a temperature of 101 degrees, so he received some medicine, and he went back to the pediatrician, who suggested it might be a viral illness that caused the nosebleed, vomiting, and now fever. The boy was checked for COVID-19, had a chest X-ray to rule out pneumonia, and was believed to be suffering from an infection called bronchiolitis. He was advised to hydrate, rest, and return if necessary. There was no battery appearing in the X-rays at this point.

36.    On Saturday, JOHNATHAN moved slowly, but watched his favorite TV show, "Bubble Guppies," and had some snacks. He went to sleep that night, and his fever abated. Then on Sunday, JOHNATHAN, who had been snuggling on his mom's lap, coughed hard, jumped out of his mom's lap, and started coughing up blood. JOHNATHAN's father skipped his Sunday shift to stay home under the circumstances. Around 9 a.m., he again started coughing really hard and this time vomited bright red blood, indicating oxygenated arterial bleeding. Baby JOHNATHAN started posturing like he was going to have a seizure, as his mother (who is a trained Physician Assistant) and his father (who is a trained paramedic) called

COMPLAINT

911.  JOHNATHAN's hands drew up, his lips turned blue, and he lost consciousness.  His father felt as his pulse slipped away.  The parents immediately started CPR, cleared his airway, and gave JOHNATHAN emergency rescue breathing and compressions, but blood just continued to pour out of the small boy's tiny body.

37.  Regrettably, all of the bleeding, CPR and the life saving efforts had to be performed right in front of JOHNATHAN's older brother, M. H., who suffers to this day because of the severe emotional trauma of seeing this happen to his baby brother.

38.  Ambulance staff carried out emergency medical care and rushed him to Moses H. Cone Hospital in North Carolina.  Jackie rode with the Sheriff and Johnathan rode by ambulance with his father.  But when she arrived at the hospital, JOHNATHAN had already passed away and a chaplain was waiting.

39.  The nurses tried to draw blood for labs but said there was no blood in his small body due to all the profuse bleeding.

40.  An autopsy later revealed a button battery was found in JOHNATHAN's body and that his cause of death was a massive gastrointestinal bleed at the distal esophagus, as well as an aortic bleed due to the caustic batter chemical eroding through his esophagus and into the aorta.

41.  It would be an understatement to say that parents, Jackie and Anthony, were shocked at the news of the button battery.  Once home, they desperately searched the house to see where the battery might have originated.  The search was not a long one.  They went to where the remotes were kept in the house and found the ESKY remote, with its back off.  The battery was missing.

14

COMPLAINT

42.    JOHNATHAN was laid to rest on December 27, 2020 in Kentucky.



## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### (*Negligent Product Liability*)

43.    PLAINTIFFS incorporate each and every allegation above as though fully set forth herein.

44.    DEFENDANTS were engaged in the manufacture, design, testing, producing, inspecting, vending, distributing, introducing into interstate commerce, transporting in interstate commerce, advertising, selling, installing, assembling, or recommending for use to the general public the Defective Product.

15

45.    DEFENDANTS owed duties of care to actual and potential customers and consumers with respect to the Product.  Such duties included but were not limited to: designing, formulating, manufacturing, distributing, selling, and providing the product in a fashion that was safe to consumers; packaging the Product safely so as to reasonably minimize the potential for injury; labeling the Product so as to reasonably warn consumers of the potential for danger; and reasonably applying knowledge and information from past incidents, complaints, studies, observations, reports, experience, or investigation to provide for the safety of consumers with respect to the products.

46.    DEFENDANTS knew or should have known that if the Product was not properly and carefully manufactured, designed, tested, inspected, assembled, delivered, molded, labeled, warned, and signed prior to sale or distribution to consumers, it would, if used by any member of the general public, be a substantial factor in causing serious and permanent injury.

47.    DEFENDANTS negligently and carelessly manufactured, designed, tested, maintained, inspected, installed, assembled, delivered, molded, labeled, failed to warn, signed and sold the Product so that it was in a dangerous and defective condition and unsafe for the use and purposes for which it were intended.

48.    The condition of the Product was known to DEFENDANTS, and each of them, or should have been discovered by them through the exercise of ordinary care and reasonable diligence, but was not disclosed or made known to purchasers or users of the Product, including PLAINTIFFS.

16

COMPLAINT

49.     The purchasers or users of the Product had no knowledge of the defective condition of the Product or of any danger in the use of the Product.

50.     In doing the acts alleged in this Complaint, DEFENDANTS violated statutes, rules, standards, regulations or guidelines applicable to DEFENDANTS' conduct, including laws and regulations relating to the manufacture, distribution, and sale of the Defective Product and similar items.

51.     The injuries and damages to PLAINTIFFS described more fully above were a direct and legal result of the violations of the statutes, rules, regulations, standards, and guidelines by DEFENDANTS.

52.     The statutes, regulations, standards, and guidelines violated by DEFENDANTS were drafted, written, and designed to prevent the type of incidents and injuries that occurred in this case, and PLAINTIFFS are among the class of persons the statutes, regulations, standards, and guidelines were designed to protect.

53.     As a direct and legal result of the negligence and carelessness of the DEFENDANTS, and each of them, PLAINTIFFS suffered severe shock, injuries, and wrongful death.

54.     PLAINTIFFS were also injured in their health, all to PLAINTIFFS general damages in a sum which will be shown according to proof.

55.     As a further direct and legal result of the negligence and carelessness of the DEFENDANTS, and each of them, PLAINTIFFS were compelled to and did incur expenses for medical care, hospitalization, nursing and attendant care and other incidental expenses and will

17

COMPLAINT

have to incur additional like expenses in the future, all in amounts presently unknown to PLAINTIFFS.  PLAINTIFFS therefore ask leave of court either to amend this complaint so as to show the amount of the medical expenses, when ascertained, or to prove the amount at the time of trial.

56.    As a direct and legal result of the negligence and carelessness of the DEFENDANTS, and each of them, PLAINTIFFS were damaged and disabled during his life (JOHNATHAN) and suffered immeasurably in terms of their emotional distress and continuing injuries.

57.    The negligence and carelessness of the DEFENDANTS was a substantial factor in causing the injuries and damages alleged above.

58.    PLAINTIFFS hereby incorporate by reference each and every allegation articulated above as though hilly set forth herein.

## SECOND CAUSE OF ACTION
### (*Strict Product Liability—Design and Manufacturing Defect*)

59.    At the time that the Product left the control of DEFENDANTS, the Product was dangerous and defective as a result of design and manufacture by DEFENDANTS.

60.    At all times relevant, DEFENDANTS, and each of them, knew and intended that the Product would be purchased, and used by members of the general public who would rely on DEFENDANTS to safely design, manufacture, market and distribute the Product in a safe manner and to transmit relevant warnings about the product.

18

61.     At the time of the incident giving rise to this Complaint, the Product was being used in a manner and fashion that was foreseeable by DEFENDANTS, and each of them, and in a manner in which the Product was intended to be used.

62.     DEFENDANTS manufactured and designed the Product defectively or knew its manufacture or design was defective, or both, causing the Product to fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

63.     In addition, the risks inherent in the design of the Product, and especially the non-secured remote device far outweigh any benefits of that design.

64.     As a legal result of the aforementioned dangerous and defective condition of the Product, PLAINTIFFS were injured and suffered damage as alleged.

### THIRD CAUSE OF ACTION
### (*Strict Product Liability—Failure to Warn of Defective Condition*)

65.     Plaintiff incorporates each and every allegation above as though fully set forth herein.

66.     The Product was in a dangerous and defective condition when introduced into the stream of commerce by the DEFENDANTS. The Product was so defective that when used in a way that was reasonably foreseeable, the potential risks of the Product created a substantial danger to users of the Product and others, and could and would cause those serious injuries.

67.     The Product had potential risks that were known or knowable by the use of scientific knowledge available at the time of manufacture, distribution and sale of the Product. DEFENDANTS knew, or in the exercise of reasonable care, should have known that the potential or inherent risks presented a substantial danger to users of the Product because

19

COMPLAINT

defendants possessed special knowledge of the materials, design, character and assemblage of the Product. Plaintiff and ordinary consumers would not recognize, nor have knowledge that the Product was dangerous and defective.

68.    Although possessed of special knowledge of the potential risks and substantial danger to users of the Product and others, defendants failed to warn or instruct of the potential risks and dangerous and defective conditions of the Product.  DEFENDANTS failed to provide inserts or instructions warning of the dangers that a button battery that fell out of the remote could injure or kill a child that ingested the battery.  They batteries themselves failed to feature any meaningful warnings, stickers, or etchings that might have suggested the danger that the batteries might be swallowed by children, much less the severe harm that was likely to occur if that should happen.

69.    PLAINTIFFS were harmed and suffered the injuries and damages alleged as a result of DEFENDANTS' failure to warn. The lack of proper warning or instructions was a substantial factor in causing Plaintiff's harm.

## FOURTH CAUSE OF ACTION
### (*Breach of Implied Warranty*)

70.    PLAINTIFFS incorporate each and every allegation above as though fully set forth herein.

71.    At relevant times herein, DEFENDANTS marketed, manufactured, promoted, distributed or sold the Product for use by the public at large, including the PLAINTIFFS.

72.    DEFENDANTS knew the use for which their Product was intended and represented or impliedly warranted the Product to be of merchantable quality, and safe and fit

20

for its intended uses.

73.    DEFENDANTS had a duty to exercise reasonable care in the research, development, design, testing, manufacture, inspection, labeling, distribution, marketing, promotion, sale and release of the Product.

74.    PLAINTIFFS made a decision to use the Product, and reasonably relied upon the DEFENDANTS and their agents to disclose known defects, risks, dangers and side effects of the Defective Product.

75.    PLAINTIFFS had no knowledge of the falsity or incompleteness of the DEFENDANTS' statements and omissions concerning the Product when Plaintiff purchased the Product as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by DEFENDANTS.

76.    DEFENDANTS had sole access to material facts concerning the defects, and DEFENDANTS knew that users, such as PLAINTIFFS, could not have reasonably discovered such defects.

77.    By the conduct alleged, DEFENDANTS impliedly warranted to PLAINTIFFS that the Product was merchantable and fit for the purpose intended.

78.    DEFENDANTS breached this warranty in designing, manufacturing, selling, and distributing the Product in a dangerous and defective condition and in failing to warn Plaintiff and purchasers of the Product of these defects.

79.    As a direct result of the conduct of the DEFENDANTS, PLAINTIFFS have

suffered wrongful death and continue to suffer serious and permanent physical, and emotional injuries, has expended and will continue to expend large sums of money for medical care and treatment, have suffered and will continue to suffer economic loss, and have otherwise been physically, economically, and emotionally injured.

**FIFTH CAUSE OF ACTION**
*(Negligence/Negligent Undertaking/Enterprise)*

80.   PLAINTIFFS incorporate each and every allegation above as though fully set forth herein.

81.   On information and belief, AMAZON has taken steps in the form or policies or procedures to ensure the safety of products sold on its website, including through THOUSANDSHORES.   AMAZON has done this is the form of regulations, contracts, and policies with businesses selling products on its website.   According to judicial statements in *Bolger v. Amazon.com, LLC*, 4th App. CA 2020, (published 8/13/2020), "Amazon maintains a 'robust and active process' to monitor, track, and log consumer complaints.   It analyzes these complaints and determines whether to continue allowing a product to be offered for sale on Amazon.   Amazon requires third-party sellers, as a contractual matter, to comply with all applicable laws and regulations."   An AMAZON representative was quoted stating under oath: "Amazon does everything in its power and goes above and beyond to make sure that we're providing the best customer experience, including safe products.   And, you know, I want that for all of our customers and for myself when I buy from Amazon, so I hope people believe that."

82.   On information and belief, AMAZON requires, has required, or should require vendors on its platform to abide by safety standards, including but not limited to those provided

22

by UL or others about replacement batteries, and warning and for securing mechanisms for products that contain defective button batteries.

83.     AMAZON acted as a gatekeeper to keep its customers safe and can exert pressure on upstream suppliers to enhance safety.  Having accepted the role and undertaking of looking out for consumer safety, it owed a duty to exercise reasonable care to protect that undertaking. Consumers have come to expect that they can buy safe products from AMAZON and on its platform.

84.     In this case, DEFENDANTS breached this obligation, and did not take adequate precautions to ensure that the separate button batteries, or the remote transmitter sold to PLAINTIFFS were a safe products, or that there were proper safety precautions in place for the remote transmitter, and the batteries by themselves.   To the extent DEFENDANTS had regulations and protocols to promote safety, they were not followed.  These breaches were the proximate cause of harm, and a substantial factor in bringing about the injuries, damages and harms to the PLAINTIFFS.

85.     To be clear, this is a case about liability for selling a *Defective Product* that injured JOHNATHAN and members of his family.  This is *not* an action against AMAZON related to its publication of 3rd party content or speech on its website, as might be protected under 47 U.S.C. §230.  Nothing in this complaint is intended to make such a claim against AMAZON on these grounds and nothing in the complaint should be construed in such manner.

**SIXTH CAUSE OF ACTION**
(***Breach of Express Warranty***)

86.     PLAINTIFFS incorporate each and every allegation above as though fully set

23

forth herein.

87.    DEFENDANTS expressly warranted and represented to the general public and to PLAINTIFFS, and each of them, that the Product was reasonably fit for the purpose for which they were intended.

88.    PLAINTIFFS reasonably relied on those warranties and representations. The Product did not conform to the representations made by DEFENDANTS and was not fit for the purpose for which it was intended. When used in a normal and usual manner, the Product caused the serious personal injuries and death to PLAINTIFFS as more fully set forth above.

89.    DEFENDANTS' breach of their express warranties was a substantial factor in causing the injuries as alleged above.

**SEVENTH CAUSE OF ACTION**
(***Wrongful Death***)

90.    PLAINTIFFS incorporate each and every allegation above as though fully set forth herein.

91.    PLAINTIFFS bring this wrongful death cause of action by reason of the death of JOHNATHAN.  The death was the result of the negligence and Defective Product(s) discussed in the aforementioned causes of action.  Decedent's death was proximately caused by reason of wrongful acts and the negligence outlined above by the DEFENDANTS, and the PLAINTIFFS have suffered damages as a result.

92.    PLAINTIFFS have been deprived of their son and brother, and have suffered severe mental anguish, and loss of companionship.

93.    PLAINTIFFS have also been damaged by reason of incurred medical expenses,

24

burial, and funeral expenses.

## EIGHTH CAUSE OF ACTION
### (*Survival*)

94.     PLAINTIFFS incorporate each and every allegation above as though fully set forth herein.

95.     ANTHONY HUFF brings this action as a representative of the estate of the decedent, Johnathan Huff.

96.     The decedent was deprived of his young life, and before his death, he endured excruciating pain, suffering, and emotional trauma.  He could not explain his pain, because he was too young, but for days, the button battery that fell out of DEFENDANTS' Defective Product caustically burned, damaged his organs, and caused him needless pain and suffering. But for the negligence referenced in the aforementioned causes of action, JOHNATHAN would not have passed away so suddenly and needlessly, and he might have lived a full life.

97.     PLAINTIFFS have rights to recover damages relating to the pain and suffering JOHNATHAN experienced prior to his death by reason of DEFENDANTS.

## NINTH CAUSE OF ACTION
### (*Bystander Claims*)

98.     PLAINTIFFS incorporate each and every allegation above as though fully set forth herein.

99.     M. H. is a minor child, the brother of the decedent.  While he did not swallow the button battery from the Defective Product himself, he was forced to stand by and observe the CPR and profuse bleeding it caused to his baby brother.  He has been profoundly affected by

25

COMPLAINT

observing the events and has suffered severe emotional distress as a result.

100.   Johnathan's father was also in close proximity at the time of the events that produced fatal injuries to the young boy.

101.   The emotional distress and damages experienced by each of these plaintiffs has been profound, beyond what might have been anticipated by a disinterested witness, and was proximately caused by the negligent events described above pertaining to the Defective Product.

## VI.   <u>DAMAGES & RELIEF REQUESTED</u>

102.   As a direct and proximate result of DEFENDANTS' conduct above, PLAINTIFFS, individually, and on behalf of the estate of J. H., and as next-of-friend of minor Claimant, M. H., have suffered the following damages, and PLAINTIFFS pray for judgment against the DEFENDANTS and an award against each of them for:

   a.  General damages according to proof;

   b.  Lost earnings, health care expenses paid in the past, and that will be necessary in the future;

   c.  Physical pain and suffering in the past;

   d.  Physical pain and suffering which will be suffered in the future;

   e.  Mental anguish and emotional distress suffered in the past;

   f.  Mental anguish and emotional distress that will be suffered in the future;

   g.  Loss of companionship and society;

   h.  Funeral expenses, burial expenses, and all incidental expenses according to proof;

   i.  Survival damages permitted by law;

COMPLAINT

j.   For interest from the date of accident to the time of judgment;

k.   For costs of suit incurred herein;

l.   An award for punitive damages as may be permitted by law;

m.  An award of reasonable attorney fees where permitted by statute;

n.   A preliminary and permanent injunction restraining DEFENDANTS from selling the Defective Products to any other persons;

o.   A preliminary and permanent injunction requiring DEFENDANTS to notify all relevant consumers and recall the Defective Products and issue suitable recall notices to consumers who have purchased these Defective Products in the past; and,

p.   For such other and further relief as the Court deems proper.

## VII.   <u>JURY DEMAND</u>

NOTICE is hereby given that PLAINTIFFS demand a trial by jury in the above-captioned matter.

Dated: <u>April 14, 2021</u>                              Respectfully submitted,

BUCHE & ASSOCIATES, P.C.

By: *<u>/s/ John K. Buche</u>*
John K. Buche (CA Bar No. 239477)
875 Prospect St., Suite 305
La Jolla, CA 92037
Tel: (858) 459-9111
Fax: (858) 430-2426
E-mail: jbuche@buchelaw.com

*Attorneys for Plaintiffs*

27